# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE

Assigned on Briefs September 19, 2007

## STATE OF TENNESSEE v. ALEXANDER GUZMAN-CHAVEZ

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2005-A-432    Mark J. Fishburn, Judge**

———————————

**No. M2006-01680-CCA-R3-CD** - Filed April 10, 2008

———————————

Appellant, Alexander Guzman-Chavez, pled guilty to aggravated assault, with an agreed sentence of six years as a Range I offender. The parties agreed that the trial court would determine the manner of service of the sentence, and, after a hearing, the court sentenced Appellant to incarceration, denying him an alternative sentence. On appeal, Appellant contends that the trial court erred by: (1) considering enhancement factors when deciding the manner by which Appellant should serve his sentence; (2) improperly applying enhancement factor number (10), that the risk to human life was high, because a fetus is not a person for purposes of this enhancement factor; and (3) denying him an alternative sentence based, in part, on his facial expression during the sentencing hearing. Because it appears from the record that the trial court properly considered and applied the applicable enhancement factors and based its denial of an alternative sentence on appropriate considerations, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the Appellant, Alexander Guzman-Chavez.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Cameron L. Hyder, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Sarah Davis, Assistant District Attorneys General, for the Appellee, State of Tennessee.

# OPINION

In September of 2004, a Davidson County Grand Jury indicted Appellant for one count of attempted first degree murder. *See* T.C.A. §§ 39-13-202, -12-101 (2003). Pursuant to an agreement with the State, Appellant pled guilty to the offense of aggravated assault on June 2, 2006.

At the plea acceptance hearing, the prosecutor stated the factual basis for the charges as follows:

> [I]f the State went to trial, the proof would show that on the date of the 27th of September 2004, Detective Troy Smith with the domestic violence unit responded to a domestic-related shooting . . . . Patrol had arrived prior to that response and the victim had already been transported to Vanderbilt Hospital for treatment. She had received a gunshot wound to her right eye that had exited the left rear of her skull. Her survival was questionable at the point of being taken to the hospital, but she did survive this shooting. . . . . Guzman, the brother of the resident [who is also the defendant], was present when paramedics arrived, he – it was he that originally called 9-1-1 and he told them that the victim had been found in the living room of the town home. She lay on the couch in the living room, face down with her arms above her head. A bullet hole was present in the kitchen ceiling, blood was also present on the entry hall floor and the adjacent garage floor and was also present in drops from the entry hall to the couch where the victim had been found. The 10-month-old son of the victim and the resident had been found upstairs on the bed, and the .380 pistol had been found a short distance from the victim with the magazine and live round. Heiro (phonetic) Guzman and his father were questioned by detectives with domestic violence unit and they stated that the defendant, Mr. Guzman, had called his father and told his father there has been a terrible accident, take care of my son. He never at any point told his father or brother to call the police, it just so happened that his brother went to the scene and found the victim lying in the pool of her own blood. It was determined that the suspect left the scene in a white Toyota pickup with a logo for Brothers and Sons Marble and Granite Company on the side. Heiro Guzman changed his story several times while the police were there regarding the

---

[1] We note that this Court has held that aggravated assault is not a lesser included offense of attempted first degree murder. *See State v. Christopher Todd Brown*, No. M1999-00691-CCA-R3-CD, 2000 WL 262936 at *2, (Tenn. Crim. App., at Nashville, March 9, 2000), *perm. app. denied*, (Tenn. Sept. 10, 2001). The record before us does not reflect that the indictment in this case was ever amended. Nevertheless, our state supreme court has counseled that any issue with respect to the lack of an explicit amendment to an indictment in a case procedurally identical to the instant case should not be addressed as plain error. *See State v. Yoreck*, 133 S.W.3d 606, 613 (Tenn. 2004).

location of the victim when he arrived and called 9-1-1. The defendant's car was later found with the lights on and the keys in the ignition. The defendant did not give any statement regarding his involvement in this case. These events did all occur in Davidson County. And the victim, although she did survive, she did lose her eye as a result of this shooting, and she was pregnant at the time and lost the baby that she was carrying.

The trial court accepted Appellant's guilty plea. As part of the plea agreement, Appellant agreed to allow the trial court to determine the length and manner of the service of the sentence at a sentencing hearing.

At the sentencing hearing, Maria Carmen Casillas testified that she has one child, and Appellant is the father of that child. Casillas recalled the events of September 27, 2004, saying that early that evening she left the house to get some food for her and Appellant. She brought the food to his house, and they ate together. She then reminded Appellant that she had asked him to purchase a pregnancy test for her and inquired if he had the test. He said he left it in his father's truck, so Casillas left the house and went to the grocery store to purchase another test. She returned to Appellant's house and took the test, which read positive. When she informed Appellant she was pregnant, he "got mad," pushed her "hard," and said that he needed to go get their son, who was sleeping upstairs. Casillas said that she remembered nothing else that happened that evening, including the events immediately before and after the shooting.

Casillas described her recovery, telling the court that she was in the hospital for a month-and-a-half and was in a coma for almost a month. She suffered an injury to her head where the bullet came out. After waking up from her coma, a nurse told her that she lost her right eye from being shot in the head. Casillas said the child she was carrying at the time she was shot did not survive. Casillas read a letter that she wrote about the impact of this injury to the court. In it she said, among other things, that she suffers permanent-short term memory problems and brain damage. She asked the court to incarcerate Appellant.

Casillas testified she had over $20,000 in medical bills and was trying to find employment so that she could pay those bills. Before this incident, Casillas worked as a loan counselor, but, after the shooting, she had difficulties finding employment due in part to her brain injuries and memory loss. Casillas testified Appellant did not have visitation with their son, and he did not pay child support. Before this incident, Appellant saw their son frequently and paid for his babysitter occasionally. Casillas recalled that, when she first told Appellant she was pregnant with their son, he was angry because he thought the baby might not be his.

On cross-examination, Casillas testified that she had called Appellant a few months ago, and she called him fifty-seven times in a three-week period of time. She also visited him at work three or four times and brought her son with her. She agreed that these were social visits. On redirect examination, Casillas testified that she first called Appellant because he sent her a letter requesting that she do so.

Appellant testified that he had graduated high school and studied for a couple of years at a junior college in Nashville. Appellant stopped going to school because he wanted to spend his afternoons with his son. Appellant worked for his father in a management position at Brothers and Sons Marble and Granite.

Appellant said that he and Casillas had dated since October of 2001. They broke off their relationship a couple of times, but they had a son together six or seven months before this incident. Appellant did not see his son very much the first couple of months of his life because Casillas's family did not like Appellant. After the first months, he and Casillas made arrangements for Appellant to pick up their son and take him to Appellant's house. When Casillas was finished working, sometimes around 9:00 p.m., she would come and pick up their son. During this time, he and Casillas started to see each other again socially.

Appellant described the events surrounding the shooting saying that Saturday night, the night before the shooting, he and his son attended a birthday party for one of his relatives. On their way home, he purchased a pregnancy test at Casillas's request and arrived home around 7:00 p.m. Casillas came over to his house, and she took the pregnancy test, which was positive. Appellant said that he told Casillas before she left that evening that he intended to marry her. On Sunday, Casillas called him around 1:00 p.m. and said she wanted to come over to his house. She arrived around 2:00 p.m., they fed their son, put him to sleep, and then Casillas went and got the two of them food while he stayed with their son.

Appellant testified that, after Casillas brought back the food, she fed their son again and put him back to sleep. He said that he kept a gun in the house because he lived alone, and his son was too young to get to the gun. The gun was in the living room because the night before he heard a noise, and he went downstairs to investigate it. He fell asleep on the couch with the gun on top of the ottoman. Appellant said that he wanted to unload the gun. As part of this process, he pulled the trigger, and he accidentally fired the gun. He looked over and saw Casillas slumped forward on the floor. When he realized that the bullet had entered Casillas's eye, he froze. He thought he should take her to the hospital, but he could not lift her. He tried to pull her to the car, and he was able to get her into the garage. Appellant said that he then panicked, and he did not recall much of what happened thereafter. He did remember that he called his father and that he left the house. Appellant went to a lake approximately one mile from his house. Appellant testified that his father went to the house and called 9-1-1.

Appellant denied that he was angry about Casillas's being pregnant and that he ever pushed her. He said that he and Casillas were watching a music video DVD because he wanted her to hear some songs that told her how he felt about her. Appellant said he knew their child was upstairs, and he did not fire this gun intentionally. He admitted, however, that his actions with respect to unloading the gun were reckless in part because he had never taken a gun safety course and had never before shot the gun.

On cross-examination, Appellant testified that his only previous conviction was for DUI in 2002. Appellant denied that he ever hit or assaulted Casillas before this incident. He said he

took the gun one or two months before the shooting from his brother because he did not think his brother was responsible enough to have a gun. Appellant could not explain why he chose that time to unload his gun or why he pulled the trigger when he thought the gun was empty. He said that it never occurred to him that the gun might still have a bullet in it when he pulled the trigger. Appellant maintained that, after he shot Casillas, he dragged her to the driver's side of his car in the garage. He was then shown photographs showing a drag mark and a pool of blood near the trunk of his car, but he said he only remembered getting her as far as the rear wheel of the driver's side of the car. After dragging Casillas, Appellant panicked and called his father, telling his father that there had been a terrible accident. He agreed he never asked his father to call 9-1-1, and he never went to the police himself.

On redirect examination, Appellant testified that he intended to drag Casillas to the passenger's side of his car, so he could drive her to the hospital. He, however, lacked the strength to drag her far enough. He said his trunk was full of speakers for his car, and he never intended to put Casillas in his trunk. Appellant said he turned himself in to the police within a couple of days of this shooting. He testified he did not attempt to clean up the blood in his house, did not move the gun, and did not remove the bullet that had entered the ceiling.

The State asked the trial court to incorporate the testimony from a previous hearing when making its determination. At a previous hearing, Casillas testified that Appellant had hit her on a previous occasion. She called the police and called her brother to come and get her. As a result of this incident, Casillas suffered bruises to her arms, which were noticed by a teacher at the school she attended. Casillas recalled another incident when Appellant was drunk and threatened to shoot her. She called 9-1-1 twice and hung up both times. She wrested the gun away from Appellant and threw it away. Casillas said that Appellant always had a gun in the house. Casillas recalled that a police officer came to her house in response to her 9-1-1 hangups, but she did not tell him what had happened because she was scared.

Casillas further testified at the previous hearing that Appellant hit her several times. In December of 2001 or 2002 she became pregnant by appellant. She lost that child, and she said that she may have lost the child because Appellant hit her. Casillas became pregnant again, and Appellant hit her in the stomach while she was pregnant. Casillas recalled another occasion when Appellant hit her so hard on the top of her head that she lost feeling to one side of her face. She went to the hospital for treatment of her injuries, which included bruises.

Juan Casillas, Maria Casillas's brother, testified at the prior hearing that he recalled a time when the police called him and told him to pick up his sister at Appellant's house. When he did so, one of the two police officers there told him that his sister and Appellant had been in a "bad argument," and the officers were trying to determine what had happened. Juan Casillas said that, after this incident, Maria moved back home with him and his mother.

-5-

Based up this evidence, the trial court found when sentencing Appellant the following findings with regard to alternative sentencing:

> The Court has considered the evidence presented at the sentencing hearing yesterday, as well as this morning, and also the previous hearings that we have had in this case, which have been incorporated into this sentencing hearing. The presentence report and sentencing principles involving T.C.A. 40-35-102 and 103, arguments as to alternative sentencing, the nature and characteristics of the criminal conduct involved, the evidence and information on enhancement and mitigating factors, statements of the defendant, his testimony here at the sentencing hearing, and the defendant's potential for rehabilitation and treatment as previously stated.

> The parties have agreed to a six-year sentence as a Range I offender. The purpose of this hearing is simply to determine the method of that in which he will serve his sentence. The Court has looked at the enhancement factors under 40-35-114. The Court finds that the defendant does have a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range.

> His actual criminal, formal official criminal record, is one DUI, which is certainly not that significant, but the Court does find that there were prior incidences of domestic turbulence in this relationship.

> The defendant argued yesterday afternoon that, you know, where are the arrest reports where the police had [gone] there and things of this nature, but Juan Casillas testified at a prior hearing that he got a call from the police who were at his house. This is the incident where a gun was pulled and he threatened to kill her and she threw the gun away, asking [Juan] to come pick her up. So why there may not be any official reports, there was clearly evidence – it was never disputed that they weren't called on that occasion. In fact, the reason they showed up is the evidence showed there was two 9-1-1 hang ups and they came out in response to the 9-1-1 hang ups. I certainly don't believe that this is the first time that there were problems between this particular couple.

> Also the Court finds enhancement factor No. 6, that personal injuries were inflicted up on the victim, Maria Casillas. She testified at length yesterday to the significance of her injuries, her total loss of her right eye, I believe it was. She has permanent and short-term memory loss. She has difficulty getting her thoughts together at times and being able to express herself or communicate

---

[2]Because of Appellant's arguments and our standard of review, we quote extensively from the trial court's findings.

sometimes, things get jumbled and things of this nature.  She also testified to the fact of her ability to work, particularly as a result of the short-term memory loss, and things of this nature.  The injuries were much more extensive than that required to establish the underlying offense.

. . . .

The reason I think [enhancement factor] No. 10 [that the defendant had no hesitation about committing a crime when the risk to human life was high] does apply is, the case law seems to suggest that the risk to human life, whether they make a distinction of that, -- in all of the other enhan[ce]ment factors they use the term or person and the risk to human life they interpret, since that is a totally different term and the only time used in the enhan[ce]ment factors, that human life would include a fetus whether it is viable or not.  So I find that that particular enhan[ce]ment factor applies.

I do not find that any of the mitigating factors apply. . . . [T]he Court does not find that this was an accidental shooting.

. . . .

In looking at the factors as to whether or not Mr. Guzman should receive some type of alternative sentencing, first of all, he does not qualify for Community Corrections because this was an offense involving violence and a weapon.  There is nothing before the Court that suggests any particular special needs that would otherwise allow Community Corrections to apply.

Clearly being a Class C felony, he is a favorable candidate for probation. I have considered a number of factors in determining whether or not the defendant is an appropriate candidate for probation.  There are clearly a significant number of factors that weigh favorable to him.  Although, I have mentioned the enhancement factor, and I still agree that it is an enhancement factor and although I don't put insignificant weight on it, he doesn't have much of a criminal record, although there was some criminal activity involved.

He successfully completed the term of probation that he was on for the DUI.  As far as I could tell there was no evidence to the contrary.  He has a good job.  He has good family support . . . [and] good community support.

He hasn't been rearrested or there is no inclination that he has any further problems with the law since his arrest on this particular case, and he has complied with all of the terms and conditions of his bond.  Although, there has been some disputes, and we have been back in court on this several times or at least one prior

occasions about communications between the parties, but overall he has done what he is suppose[d] to do under the terms and conditions of his bond.

There is no drug history or anything of that nature that needs to be addressed. He appears, since his DUI, to have resolved any alcohol issues that he may have had. There are a number of factors that look very favorable to him getting alternative sentencing.

The Court recognizes that the sentencing laws provide that priority for sentences involving incarceration are primarily intended for convicted felons who commit the most severe offenses, possess a criminal history with a clear disregard of laws and morals of society, and do show a failure of past efforts of rehabilitation.

The Court further recognizes that the sentence imposed should be the least severe in measure necessary to achieve the purpose for which the sentence is imposed. Accordingly, I am going to give specific reasons for this, notwithstanding that he is in many respects a good candidate for probation. . . . I do not think under any – I just do not accept the version that the defendant has given us as to what happened on this particular day.

. . . .

I think that in this case incarceration is necessary to avoid [de]preciating the seriousness of the offense. The Court recognizes that when relying on that to incarcerate someone that the offense has to be particularly violent or horrifying or reprehensible and shocking, and I just find all of those factors there.

He has a six-month old child upstairs sleeping, he has a loved one who, whether at that very moment or twenty-four hours before, learns that his girlfriend is pregnant with his child, that he could shoot her and walk away from it. On the stand yesterday he admitted under cross-examination, Yes, I left her there to die.

I didn't apply the enhan[ce]ment factor for treating the victim with exceptional cruelty but, to me, it is just absolutely cold blooded that he would shoot somebody like that and not even think about calling 9-1-1. If you are panicked, you run out the door screaming, help, help, something. He drags her body into the garage and calls dad and says, basically, Dad, you need to come clean up my mess. I mean that, to me, it is reprehensible. I mean, it certainly shocks my conscious that he could act the way he acted under those circumstances.

But the t[ell] tale sign of it all, and probably one of the most significant factors that he is not getting some form of alternative sentencing, is that when he

is telling his version of his story yesterday he sat there with this little sm[i]rky grin on his face. I mean, like I don't know what the big deal is. I mean, he hasn't accepted any responsibility for this at all.

I sat there and looked at him and I stared, and he just kept with this grin, this little sm[i]rk on his face through the most important part of what the hearing was all about, exactly what happened on that day. It wasn't just one little small one, it was five or six times through the main part of his testimony on what happened that day, this little sm[i]rk keeps coming up on his face.

I mean, he, obviously, feels no remorse at all for what occurred. He never did say he was sorry. Even if it was an accident, you say I'm sorry. Instead, I get this little sm[i]rky grin while he's reflecting back on the events of that particular afternoon.

I was already struggling on how to deal with this case up until that point, but that was probably the crowning glory of it. That just indicated just how cold-blooded his actions were on that day, and how unaffected he has been by this whole thing. He left her there to die, and I don't know, but all for the grace of god or some outstanding medical staff, she didn't die.

He didn't even flinch, he just showed what kind of attitude he had, you know, it happened. It happened, let[']s move on. Coupled with the fact that I don't think this was the first incident between these people, under the circumstances, I'm going to put the sentence into effect and sentence him to six years, as a Range I offender, at 30 percent.

Appellant appeals this order of the trial court.

### *Analysis*

On appeal, Appellant contends that the trial court erred when it sentenced him to incarceration rather than an alternative sentence. He asserts that, because the trial court only had to determine the manner of sentence and not the length of sentence, it improperly considered any enhancement factors. Further, he asserts that, even if properly considered, the trial court improperly applied enhancement factor number (10) (that the risk to human life was high) because a fetus is not a person for purposes of this enhancement factor. Finally, he asserts that the trial court improperly weighed the criteria when it denied him an alternative sentence and sentenced him to incarceration based solely on the look on his face during the sentencing hearing.

When there is a challenge to the manner of service of a sentence, it is the duty of this court to conduct a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption is conditioned

upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v.* Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id.* In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely de novo. *Id.* If appellate review, however, reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. 1991).

The mechanics of arriving at an appropriate sentence are spelled out in the Criminal Sentencing Reform Act of 1989. The court is required to consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -35-103(5) (2006).

Initially, we note that the trial court properly sentenced Appellant according to the sentencing principles and guidelines set out in the 1989 Sentencing Reform Act, despite Appellant's claim to the contrary. We, in part, quoted extensively from the trial court's findings to make it clear that it considered the principles and guidelines of the Act. It clearly and adeptly navigated the proper sentencing considerations and the impact of those considerations when it determined whether to grant or deny Appellant an alternative sentence. We, therefore, afford the trial court's findings a presumption of correctness.

We also note that Appellant was statutorily eligible to serve an alternative sentence. In regards to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal history evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D or E felony should be

considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6) (2006).

The presumption of favorable candidacy for alternative sentencing in general, which is applicable in the present case, may be overcome by showing that at least one of the conditions set forth in Tennessee Code Annotated section 40-35-103(1) is met. *See State v. Richard Swiney*, No. E2006-01965-CCA-R3-CD, 2007 WL 2333032, at *4 (Tenn. Crim. App., at Knoxville, Aug. 16, 2007). These considerations include:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C). The court should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence. T.C.A. § 40-35-103(5).

When the alternative sentence sought is probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, his present condition, including physical and mental condition, and the deterrent effect on the defendant. *See State v. Kendrick*, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999). Moreover, in *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983), the Supreme Court held that truthfulness is certainly a factor which the court may consider in deciding whether to grant or deny probation. Furthermore, regarding probation, the trial court should consider the nature and circumstances.

We conclude that there is no merit with regard to Appellant's first argument, that the trial court improperly considered enhancement factors when determining his manner of sentence. In fact, the Sentencing Act, as stated above, makes that part of the trial court's considerations when determining manner of service of sentence as well as length of sentence. *See* T.C.A. §§ 40-35-210(a), (b), -35-103(5).

Appellant next contends the trial court improperly applied enhancement factor number (10), that the risk to human life was high, because a fetus is not a person for purposes of this

---

[3]The 2005 amendment removed the language that provided that the described offenders were presumptively eligible for alternative sentencing in the absence of evidence to the contrary and made the guidelines "advisory" in nature.) However, this presumption does not entitle all offenders to alternative sentence; rather, it requires that sentencing issues be determined by the facts and circumstances presented in each case. *See State v. Taylor*, 744 S.W.2d 919, 922 9Tenn. Crim. App. 1987).

enhancement factor. This Court squarely addressed this issue in *State v. Melissa D. Hayman*. No. E2001-01600-CCA-R3-CD, 2002 WL 31126632, at \*6 (Tenn. Crim. App., at Knoxville, Sept. 26, 2002), *perm. app. denied* (Tenn. Feb. 18, 2003). In that case, the defendant was convicted of, among other crimes, the aggravated assault of a pregnant victim. *Id.* at \*1. The trial court therein applied enhancement factor (10), relying on the fact that the victim was pregnant and the attack threatened the viability of the fetus as well as the victim's life. *Id.* at \*5. We held:

> With respect to factor (10), we note that every aggravated assault with a deadly weapon includes a high risk to human life. Nevertheless, we agree with the trial court that this factor is applicable under the facts of this case because the victim was pregnant, and the life of the fetus was also at high risk. We note that the Defendant was aware that the victim was pregnant . . . . The risk to an unborn fetus is not necessarily present in every aggravated assault with a deadly weapon and is therefore, we find, properly applied to this case.

*Id.* at \*6.

In an important footnote, this Court explained:

> We acknowledge that our legislature has determined that only viable fetuses may be victims of assaultive offenses and criminal homicides, *see* Tenn. Code Ann. §§ 39-17-107(a), 39-13-214(a), and that there was no proof concerning the viability of the fetus carried by the victim in this case. However, we do not view our finding that enhancement factor (10) is properly applied in this case on the basis of the victim's pregnancy to be in conflict with those statutory provisions. Rather, we consider the legislature's use of the term "human life" in this particular enhancement factor to be broad enough to encompass the potential human life inherent in all pregnancies. *See Planned Parenthood v. Sundquist*, 38 S.W.3d 1, 17 (Tenn. 2000). We note that, in the other enhancement factors focusing on the effect(s) of the offense on others, the legislature used the terms "victim" and/or "person." *See* Tenn. Code Ann. § 40-35-114(3), (4), (5), (6), (7), (11), (12), (16), (18), (19). The much broader term "human life" indicates, we think, the legislature's intent to enhance the punishment of those who engage in activities that threaten not only the victim's life, but the expectant human life inherent in the victim's pregnancy, at least where the defendant is aware of the pregnancy.

*Id.* at \*6 n.5.

-12-

In accordance with our holding in *Hayman*, we conclude that the trial court herein did not err when it applied enhancement factor (10). Appellant admitted that he was aware that the victim was pregnant with his child. The trial court found implausible Appellant's contention that he accidentally shot the victim, dragged her to the trunk of his car, left her in the garage, and left the house without calling 9-1-1. The trial court found that Appellant shot the victim intentionally, based in part on the fact that Appellant had previously assaulted the victim, threatened her with a gun, and previously become angry when he learned she was pregnant. Appellant, the court found, shot the victim intentionally, knowing that she was with child. The evidence does not preponderate against these findings, and the trial court properly applied this enhancement factor.

Finally, Appellant asserts that the trial court improperly weighed the criteria when it denied him an alternative sentence and sentenced him to incarceration based solely on the look on his face during the sentencing hearing. It is clear from the transcript that the trial judge considered the "sm[i]rk" on Appellant's face to be a sign that he had no remorse for his actions. The judge did, in fact, afford this fact great weight. The trial judge also made clear, however, that he was "shocked" by Appellant's actions and that he found those actions "reprehensible." These are appropriate considerations upon which to base the denial of an alternative sentence, and the evidence does not preponderate against the trial court so doing.

*Conclusion*

In light of the foregoing, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE

-13-